IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

LYNN A. CRYSLER,

                              Plaintiff,

           vs.                                    Civil Action No.
                                                  5:05-CV-1132 (LEK/DEP)

MICHAEL J. ASTRUE, Commissioner
of Social Security,[1]

                              Defendant.

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

OLINSKY, SHURTLIFF LAW FIRM        JAYA A. SHURTLIFF, ESQ.
300 S. State Street
Fifth Floor
Syracuse, NY 13202

FOR DEFENDANT:

HON. GLENN T. SUDDABY              WILLIAM H. PEASE, ESQ.
United States Attorney for the     Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

---

[1]      Plaintiff's complaint, which was filed on September 8, 2005, named Jo
Anne B. Barnhart, the former Commissioner of Social Security, as the defendant.  On
February 12, 2007, Michael J. Astrue took office as Social Security Commissioner.  He
has therefore been substituted as the named defendant in this matter pursuant to Rule
25(d)(1) of the Federal Rules of Civil Procedure, and no further action is required in
order to effectuate this change.  *See* 42 U.S.C. § 405(g).

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Lynn A. Crysler, who suffers from various diagnosed conditions including fibromyaligia, chronic pain, fatigue, back pain, headaches, and depression, has commenced this proceeding seeking judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits under the Social Security Act, based upon an administrative determination that she was not disabled at the relevant times.  Plaintiff maintains that in finding no disability, the administrative law judge ("ALJ") assigned by the agency to hear and decide the matter erred in a number of significant ways, including by 1) failing to properly advise her of the right to legal representation and to ensure she had received adequate written notice of that right; 2) failing to meet his duty to develop the record, particularly in light of plaintiff's *pro se* status; 3) failing to accord proper deference to opinions of her treating physicians; 4) failing, when determining plaintiff's residual functional capacity ("RFC"), to discuss her limitations on a function-by-function basis; 5) relying upon the medical-vocational guidelines (the "grid") set forth in the regulations, 20 C.F.R. Pt. 404, Subpt. P. App. 2, to direct a finding of

no disability; and 5) improperly rejecting, as not fully credible, plaintiff's complaints of disabling pain without proper explanation or support.

Having carefully reviewed the record now before the court, I find that the ALJ shirked his obligation to properly develop the record concerning plaintiff's RFC by failing to seek additional information from her treating physicians, and additionally erred in a number of significant other ways in analyzing the available evidence regarding plaintiff's condition and its effect upon her ability to perform work-related activities. I am therefore unable to conclude that the Commissioner's determination resulted from the application of proper legal principles and is supported by substantial evidence, and accordingly, recommend that the determination be reversed and the matter remanded to the agency for further proceedings.

I.   BACKGROUND

The plaintiff was born in 1971; at the time of issuance of the ALJ's determination in this matter, she was thirty-three years old. Administrative Transcript at 40, 86.[2]  At the times relevant to her claim for benefits, plaintiff lived with her parents and brother in a mobile home located in

---

[2]     Portions of the administrative transcript filed by the Commissioner and comprised of evidence and proceedings before the agency, Dkt. No. 6, will be cited herein as "AT ___."

Marietta, New York.  AT 39-40, 88.  Plaintiff is a high school graduate, and additionally has undergone some Board of Cooperative Educational Services ("BOCES") training in the field of floral design.  AT 40-41, 106.

Plaintiff has not worked since in or about January of 2003.[3]  AT 42, 101, 108.  Plaintiff's past employment experiences have included working as a floral designer, a temporary office employee, and a sales associate.  AT 45-48,101.  Plaintiff testified that she supports herself using the proceeds of a settlement in a workers' compensation case involving her last employer, as well as through financial support received from parents.  AT 42-44.

Plaintiff's medical difficulties began on November 1, 2002, when she was admitted to Community General Hospital with complaints of right side abdominal pain.  AT 164-70.  After ruling out other possible causes of her symptomology, including appendicitis and gynecologic origins, treating doctors at the hospital included that the plaintiff most likely suffered from

---

[3]      Although it is clear that plaintiff continued working, at least for some period of time, following her attributed disability onset date of November 1, 2002, *see* AT 86, the record is equivocal as to precisely when, and under what circumstances, that employment ended, and specifically whether it was in December of 2002, or during the following month.  *Compare* AT 18 (ALJ finding that plaintiff failed to work after December 9, 2002) with AT 101, 108 (affixing the end date of her floral shop experience at January, 2003).

polyserositis. AT 165-66.  After being treated with steroids to address that possibility, plaintiff reported feeling better and was discharged from the hospital on November 6, 2002.[4]  *Id.*

Following her hospital visit plaintiff pursued further treatment with Dr. Andrew Merritt and a Nurse Practitioner ("NP") working in his office, Nancy Hudson.  AT 242-44.  Plaintiff was referred by Dr. Merritt on January 6, 2003 to Dr. Saad G. Sobhy for evaluation and pain management.  AT 178-80.  Following an examination, Dr. Sobhy diagnosed the plaintiff as suffering from myofascial pain syndrome, for which he recommended exercise and possible trigger point injections.[5]  AT 180.

On April 21, 2003 plaintiff was referred by Dr. Merritt to Dr. Lorne A. Runge, a rheumotoligist, for further analysis of her complaints of pain and muscle spasms.  AT 200-01.  Based upon his examination of the plaintiff, Dr. Runge discerned the existence of moderately severe soft tissue

---

[4]      Polyserositis is the "[c]hronic inflammation of several serous membranes with effusions in serous cavities resulting in fibrous thickening of the serosa and constrictive pericarditis."  THE AMERICAN HERITAGE MEDICAL DICTIONARY 650 (Revised ed. 2007).

[5]      Myofascial pain syndrome is "[m]uscular pain in numerous body regions that can be reproduced by pressure on trigger points, localized hardenings in skeletal muscle tissue.  Pain is referred to a location distant from the trigger points.  Medical Dictionary Online, *available at* http://www.online-medical-dictionary.org/omd.asp?q= myofascial+pain+syndrome (last visited April 30, 2008).

tenderness in the trapezius muscles, paraspinal muscles of the cervical, upper thoracic, and lumbar spines, deltoids, lateral humeral epicondyles, and anserine bursae of the knees, but without swelling of any joints.  AT 201. Dr. Runge diagnosed plaintiff as suffering from fibromyalgia, and advised her to begin a graduated exercise program starting with ten minutes of activity in the morning and then later in the day.[6]  *Id.*

A follow-up examination of the plaintiff was conducted by Dr. Runge on May 20, 2003.  AT 199.  While noting some ongoing tenderness on that occasion, Dr. Runge also reported that plaintiff's pain had improved with exercise and determined that she could resume her employment as a florist, noting that there was no reason why she was unable to work.[7]  *Id.*

Plaintiff continued to treat with Dr. Runge into 2004.  *See, e.g.,* AT

---

[6]     Fibromyalgia is "a common nonarticular rheumatic syndrome characterized by myalgia and multiple points of focal muscle tenderness to palpation (trigger points).  Muscle pain is typically aggravated by inactivity or exposure to cold. This condition is often associated with general symptoms, such as sleep disturbances, fatigue, stiffness, [headaches], and occasionally [depression]."  Medical Dictionary Online, *available at* http://www.online-medicaldictionary.org/omd.asp?q=fibromyalgia (citing ADAMS ET AL., PRINCIPLES OF NEUROLOGY 1494-95 (6th ed.) (last visited April 30, 2008)).; *see also* Fibromyalgia Symptoms, *available at* http://www.fibromyalgia-symptoms.org/fibromyalgia_diagnosis.html (last visited April 30, 2008) (diagraming 18 points of tenderness).

[7]     This recommendation is consistent with a note made by Nurse Practitioner Hudson in January of 2003, reporting that plaintiff was at that point cleared for part-time work with the expectation that she would increase to full time employment. AT 241.

196, 182.  Based upon an examination conducted on October 16, 2003,

Dr. Runge determined that there had been a definite worsening of

plaintiff's symptoms, accordingly, urging her to recommit to an exercise

program, starting with five minutes for two weeks and gradually adding

five minutes of light cardiovascular, walking, or biking, additionally

prescribing Ibuprofen for pain.  AT 196.  A subsequent examination by Dr.

Runge, conducted on February 20, 2004, revealed severe local

tenderness about the trapezius muscles and deltoids, leading him to

conclude that plaintiff's fibromyalgia was moderately symptomatic, and to

recommend that she pace her activities in order to avoid marked

increases in discomfort.  AT 182.

Among the strategies utilized by the plaintiff to address her condition

has been physical therapy, which she attended from November of 2003

until March, 2004.  AT 204-13.  It was reported that with physical therapy,

plaintiff's condition approved and she was experiencing less pain and able

to increase her activities at home.  AT 204-11.  Plaintiff at one time also

reportedly attended aquatic physical therapy three times a week for eight

weeks, in order to address her fibromyalga.  AT 236-38.

In response to plaintiff's complaints of headaches,[8] neck pain and shoulder pain, Dr. Merritt ordered that magnetic resonance imaging ("MRI") testing be conducted of plaintiff's cervical spine.  *See* AT 232. Results of that MRI testing revealed a small central disc protrusion at C6-7, but without significant compromise of the cervical cord, and with no significant spinal canal or foraminal compromise detected apart from the mild degenerative disc disease identified at the C6-7 level.  *Id.*

MRI testing of plaintiff's thoracic and lumbar spine was later ordered by Dr. Merritt on March 24, 2004, based upon plaintiff's complaint of back pain and leg cramps.  AT 227-29.  While the results of the thoracic spine MRI were unremarkable, testing of the lumbar spine showed degenerative disc disease at the L4-5 level with dessication of the nucleus pulposis, possible tiny tears of the annulus fibrosis at L3-4 and L4-5, with mild broad posterior prominence of degenerative material at L3-4, L4-5, and L5-S1, although without significant spinal stenosis or neural foraminal encroachment.  AT 227-28.

Plaintiff was examined by Dr. Linda Warnowicz, who practices out of

---

[8]     Plaintiff has also reported experiencing frequent migraine headaches. *See, e.g.* AT 232, 235. During a visit to Dr. Merritt's office in December of 2003, she noted that after taking Topral, the headaches decreased in frequency.  AT 235.

the same office as Dr. Runge, with the assistance of Nurse Practitioner Carol Stoianoff, on May 21, 2004.  AT 282.  Based upon the results of examination conducted on that date the diagnosis of fibromyalgia, described as stable with ongoing symptoms, was continued without medication changes, and plaintiff "was advised to continue to exercise including stretching."  AT 282.  During a subsequent visit in July of 2004 to Dr. Merritt's office, plaintiff reported to NP Hudson having daily headaches and that her fibromyalgia was acting up.  AT 289.  Plaintiff was given a prescription for Hydrocodone on that occasion.  *Id.*

In light of plaintiff's continued complaints of migraine headaches, she was referred by Dr. Merritt to Dr. T. S. Ramachandran, at Upstate Health Care Center, in July of 2004.  AT 322-24.  Based upon his examination Dr. Ramachandran diagnosed the plaintiff as suffering from mixed headache syndrome, and recommended that Topral and Prozac be discontinued, in favor of the use of Amitriptyline, one of the two anti-depressants previously prescribed, as well as Topamax for control of plaintiff's headaches.  AT 323.  Dr. Ramachandran also ordered an MRI of the plaintiff's brain, as well as an electroencepholograph ("EEG"), and suggested that she return to the clinic in six weeks.  AT 323.

Plaintiff was examined on September 16, 2004 by Dr. Cornelia Mihai, another neurologist.  AT 319-21.  Dr. Mihai made many of the same findings as her predecessors, concluding that plaintiff suffered from mixed headache syndrome, migraine and tension-type headaches, fibromyalgia and depression, prescribing Topamax in gradually increasing dosages for the headache and better control of "muscle pain".  AT 320.

According to the plaintiff, her impairments have had some affect on her daily routine, although she is still able to engage in a broad range of activity.  Plaintiff reports that she is able to drive, exercise, attend physical therapy, wash clothes, prepare meals, and do other housework, and is capable of driving herself wherever she needs to go.  AT 52-54, 118. Plaintiff is also able to shower, although she uses a hand held device for that purpose, and to watch television.  AT 117.  According to the plaintiff, she goes to Florida with her parents on occasion.[9]  AT 53.

_____

[9]      There is some indication in the record that plaintiff also suffers from symptoms of depression.  On May 18, 2004 NP Hudson noted that plaintiff's depression did not present a discrete illness, but instead was a symptom secondary to her physical health problems, with varying degrees of severity depending upon how she physically felt at any given time.  AT 226.  A Psychiatric Review Technique Form completed by an agency consultant on May 21, 2004 indicated that plaintiff had a medically determinable mental impairment but that it did not satisfy the diagnostic criteria for depression by history, nor was it sufficiently severe to meet the requirements under the Act.  AT 252-65.  In her appeal, plaintiff does not press her depression as a basis either to conclude that she is disabled or as presenting a nonexertional requirement precluding resort to the grid in order to determine the

II.     PROCEDURAL HISTORY

A.     Proceedings Before The Agency

Plaintiff filed applications for disability insurance and SSI benefits on February 23, 2004, alleging disability based upon fibromyaligia, chronic pain, fatigue, back pain, headaches, and depression extending back to an attributed onset date of November 1, 2002.  AT 100, 123, 126-27. Following the denial of those applications at the initial review level, *see* AT 58-63, a hearing was conducted, at plaintiff's request, before ALJ Charles Boyer to address plaintiff's claim for benefits.  *See* AT 26-57.  Appearing at that hearing were the plaintiff, who was not represented by counsel, and Rachelle Eddicus, a witness who testified very briefly on the plaintiff's behalf.[10]  AT 26, 55-56.

On February 25, 2005, ALJ Boyer issued a written decision finding that plaintiff was not disabled at the relevant times, and accordingly denying her claim for benefits.  AT 17-25.  After conducting a *de novo* review of plaintiff's claims for benefits, informed by the medical and other evidence amassed and the testimony adduced, ALJ Boyer applied the

_____

question of disability.

[10]     Earl Glosser, a vocational expert, was also present by video conference and available to testify during the hearing, but was not called upon to do so by the ALJ. AT 26.

now familiar, five part sequential test for determining disability, concluding

at step one that plaintiff had not engaged in substantial gainful activity

since her alleged disability onset date.  AT 24.  At steps two and three of

the disability algorythim, the ALJ concluded that plaintiff's fibromyalgia,

chronic pain, fatigue, headaches, and Crohn's disease[11] were impairments

of sufficient severity to significantly restrict her ability to perform basic

work activities, AT 24, but that they did not meet or equal any of the listed,

presumptively disabling impairments set forth in the governing regulations,

20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 25.  In making his step two

analysis, ALJ Boyer rejected plaintiff's claim that her depression also

qualified as severe, pointing to plaintiff's own statements to the effect that

her mental condition did not restrict or limit her ability to perform work-

related functions.  *See* AT 21.

Before proceeding to step four of the sequential analysis, ALJ Boyer

determined that despite the limitations imposed by her medical conditions,

plaintiff retains the residual functional capacity ("RFC") to perform the

exertional demands of a full range of sedentary work.  AT 25.  In making

---

[11]     Neither plaintiff's applications for benefits nor her hearing reflect that a claim of Crohn's disease was one of the medical conditions causing her to be disabled. It is unclear as to how the ALJ determined that this disease was part of plaintiff's claim.

that determination, ALJ Boyer relied upon medical evidence in the record, including reports generated by treating and evaluating physicians, and rejected plaintiff's subjective testimony, to the extent that it was inconsistent with that finding, as not fully credible.  AT 23, 25.  Applying that RFC, ALJ Boyer determined that plaintiff is unable to meet the requirements of any of her past relevant work as a floral designer or retail sales associate.  Proceeding to step five of the disability test, where he noted the shifting of burdens, and applying the grid as a framework, ALJ Boyer concluded that Rule 201.26 directed a finding of no disability, and accordingly denied plaintiff's applications for disability insurance and SSI benefits.  AT 23-25.  On July 14, 2005, ALJ Boyer's opinion became a final determination of the agency when the Social Security Administration Appeals Council denied her request for review of that decision.  AT 5-8.

    B.    This Action

    Plaintiff commenced this action on September 8, 2005.  Dkt. No. 1.  Issue was thereafter joined on January 5, 2006 by the Commissioner's filing of an answer, accompanied by a copy of an administrative transcript of the proceedings and evidence before the agency.  Dkt. Nos. 5, 6.  With the filing on February 21, 2006 of plaintiff's brief, Dkt. No. 7, and that on

behalf of the Commissioner on March 23, 2006, Dkt. No. 8, the matter is

now ripe for determination, and has been referred to me for the issuance

of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(d).[12]  *See also* Fed. R. Civ.

P. 72(b).

III.    DISCUSSION

       A.    Scope of Review

_____A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir. 2000); *Schaal*

*v. Apfel,* 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.

2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d

983, 985 (2d Cir. 1987)).   Where there is reasonable doubt as to whether

---

[12]        This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

the Commissioner applied the proper legal standards, his decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 148. If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel,* 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427; *Martone,* 70 F. Supp. 2d at 148 (citing *Richardson*). "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability"

in the record and it would serve no useful purpose to remand the matter

for further proceedings before the agency.  *Parker*, 626 F.2d at 235;

*Simmons v. United States R.R. Ret. Bd.,* 982 F.2d 49, 57 (2d Cir. 1992);

*Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir.

1983).

    B.    <u>Disability Determination - The Five Step Evaluation Process</u>

    The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

In addition, the Act requires that a claimant's

> physical or mental impairment or impairments
> [must be] of such severity that he is not only unable
> to do his previous work but cannot, considering his
> age, education, and work experience, engage in
> any other kind of substantial gainful work which
> exists in the national economy, regardless of
> whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he
> applied for work.

*Id.* § 423(d)(2)(A).

    The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaging in substantial gainful activity; if so, then the

claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§

404.1520(b), 416.920(b).   If the claimant is not gainfully employed, then

the second step involves an examination of whether the claimant has a

severe impairment or combination of impairments which significantly

restricts his or her physical or mental ability to perform basic work

activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer

from such an impairment, the agency must next determine whether it

meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.*

§§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so,

then the claimant is "presumptively disabled".  *Martone*, 70 F. Supp. 2d at

149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20

C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an

assessment of whether the claimant's residual functional capacity ("RFC")

precludes the performance of his or her past relevant work.  20 C.F.R. §§

404.1520(e), 416.920(e).  If it is determined that it does, then as a final

matter the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>The Evidence In This Case</u>

        1.    <u>Plaintiff's Right to Legal Representation</u>

The plaintiff, who appeared at the administrative hearing without the benefit of legal representation, first argues that the ALJ erred by proceeding with the hearing without insuring that her waiver of the right to be represented was made knowingly and voluntarily.  Plaintiff further contends that she was prejudiced as a result, and that the situation was compounded by the ALJ's failure to fulfill his duty to take measures to fill critical voids in the record.

A court reviewing a Secretary's decision "must be satisfied that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act'" in order to uphold the resulting determination.  *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)). While the law does not require the assignment of counsel to represent them in administration proceedings, Social Security claimants are "entitled to be represented by counsel at the hearing and the ALJ must ensure that the claimant is aware of this right."  *Robinson v. Sec'y of Health and Human Servs.*, 733 F.2d 255, 257 (2d Cir. 1984) (quoted in *Santana v. Apfel*, 44 F. Supp. 2d 482, 483 (E.D.N.Y. 1999)); *see also* 42 U.S.C. § 1383(d)(2)(B).  To guarantee that proper notice of a claimant's right to counsel is provided, the governing regulations require that

> [t]he Commissioner of Social Security shall notify each claimant in writing, together with the notice to such claimant of an adverse determination, of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security.  Such notification shall also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge.

*Santana*, 44 F. Supp. 2d at 483 (quoting 42 U.S.C. §§ 406(c), 1383(d)(2)(b)).  "Once a claimant has been adequately notified of the right

to proceed with a representative, a claimant may waive that right." *Osorio v. Barnhart*, No. 04 Civ. 7515, 2006 WL 1464193, at *8 (S.D.N.Y. May 30, 2006).

The record in this case reveals that the agency's efforts to apprise the plaintiff of her right to counsel were modest, and less than explicit.  In his notice of hearing, ALJ Boyer tersely provided the following advice regarding representation:

> If you want to have a representative, please get one right away.  You should show this notice to anyone you may appoint.  You or that person should also call this office to give us his or her name, address and telephone number.

AT 68.  As another court has observed with respect to a nearly identical hearing notice, this language obviously apprises the claimant of the right to be accompanied by a representative at the hearing, but does not pointedly state that that representative could be an attorney.  *Santana,* 44 F. Supp. 2d at 483-84.  Clearly, a far better practice would be for the notice of hearing to make specific reference to the fact that the representative can indeed be an attorney, and to remind the claimant of the options available for securing counsel as required by the Act.

In this instance, however, this deficiency is not in and of itself fatal.

-21-

In the notice to plaintiff advising of disapproval of her claim for benefits,

the agency specifically informed her of the right to seek legal assistance in

connection with her claim, advising her as follows:

> You can have a friend, lawyer, or someone else
> help you [with your appeal].  There are groups that
> can help you find a lawyer or give you free legal
> services if you qualify.  There are also lawyers who
> do not charge unless you win your appeal.  Your
> local Social Security office has a list of groups that
> can help you with your appeal.
>
> If you get someone to help you, you should let us
> know.  If you hire someone, we must approve the
> fee before he or she can collect it.  And if you hire
> a lawyer, we will withhold up to 25 percent of any
> past due Social Security benefits to pay toward the
> fee.  We do not withhold money from SSI benefits
> to pay your lawyer.

AT 61. This notice comports with the minimal requirements imposed by

the Act in connection with advice regarding legal representation.

     In addition to this notice, at the hearing plaintiff was again reminded

of her right to be represented by counsel during the course of the

proceeding.  Before addressing the merits of her claim, ALJ Boyer

provided the following advice to the plaintiff.

> [b]efore we go any further, I need to be sure that
> you understand your right to have an attorney or
> other representative present with you.  As we
> explained in the notice we sent to you, it's not

> mandatory that you have representation but it is
> your right.  And I just need to be sure you
> understand that before we go further.  Is it your
> desire to proceed without representation?

AT 28.  Plaintiff responded that she wished to proceed without
representation.  *Id.*  The ALJ then discussed some exhibits and, before
questioning plaintiff about her condition, again asked whether she wished
to waive her right to counsel, to which she responded affirmatively.  Under
these circumstances, I am satisfied that plaintiff was informed of her to
counsel albeit in a minimally adequate manner, and she knowingly and
intelligently waived that right.  AT 39.

### 2.    Development of the Record

Despite plaintiff's valid waiver of her right to representation, she
alleges that she was prejudiced by the ALJ's failure to fully develop the
record by gathering evidence from her treating physicians to address
ambiguities and critical voids concerning her RFC.[13]  Specifically, plaintiff
contends that the ALJ should have contacted Dr. Merritt for his
assessment of plaintiff's RFC, especially in light of the little weight

---

[13]     Plaintiff further states that she was prejudiced when the ALJ failed to
properly analyze her testimony, considered factors outside the record, and opted
against questioning the vocational expert, who was present.  These issues are properly
addressed in other portions of this report, relating to contentions raised by plaintiff
regarding her credibility and the ALJ's resort to the grid to determine the availability of
work susceptible of being performed by the plaintiff.  *See infra* Parts III.C.5 & 6, *post.*

accorded to NP Hudson's assessment, and that Dr. Runge should have
been re-contacted for a more detailed RFC assessment.

Given the remedial purpose underlying the Act and the non-
adversarial nature of Social Security benefits administrative proceedings,
an ALJ is tasked with an affirmative duty to develop the medical record
and address any incompleteness discerned.  *Tejada v. Apfel*, 167 F.3d
770, 774 (2d Cir. 1999); 20 C.F.R. §§ 404.1512(d), 416.912(d) ("Before we
make a determination that you are not disabled, we will develop your
complete medical history for at least the 12 months preceding the month
in which you file your application . . . .").  This affirmative duty becomes
more pronounced in cases involving *pro se* claimants, since an "ALJ has a
duty to adequately protect a *pro se* claimant's rights 'by ensuring that all of
the relevant facts [are] sufficiently developed and considered.'"  *Cruz v.
Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (quoting *Hankerson*, 636 F.2d at
895).  In this regard, an ALJ conducting a hearing must make "'every
reasonable effort to help [the claimant] get medical reports from [his or
her] own medical sources.'"  *Perez*, 77 F.3d at 47 (quoting 20 C.F.R. §
404.1512(d)); *see also Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 450-51
(S.D.N.Y. 2004).  "Accordingly, an ALJ may not rely, as factfinders in

adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him [or her]." *Sanchez*, 329 F. Supp. 2d at 450 (emphasis in original) (internal quotation marks and citations omitted).  In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to permit a reasoned disability determination and additional information is needed to resolve the question.  20 C.F.R. §§ 404.1512(e), 416.912(e).

While the record in this case contains a substantial body of medical evidence, there is little indication in it, aside from the report of a state agency disability analyst who is not a doctor, specifically outlining the contours of plaintiff's capacity to perform work-related activities.  It is true that the agency did attempt to obtain medical records relating to the plaintiff from Dr. Runge and Dr. Merritt, as well as Dr. Sobhy, and that Dr. Runge additionally was provided with a medical source statement to complete regarding plaintiff's RFC.  AT 266-75.  Dr. Runge failed to properly complete the medical source statement, however, instead merely stating that physical activity aggravates plaintiff's pain and that he does

not ordinarily restrict a patient's physical activity, but rather encourages the patient to maintain pace in order to avoid severe discomfort.  AT 278-81. This response from Dr. Runge is consistent with a medical source statement previously completed by the physician.  *See* AT 194.

The most significant shortcoming in the efforts to ensure a complete record comes with respect to Dr. Merritt and the ALJ's treatment of a medical source statement received from NP Hudson.  The nurse practitioner, who practices with Dr. Merritt, completed a medical source statement, dated October 27, 2004, which is significantly at odds with the ALJ's RFC finding.  *See* AT 301-03.  While plainly NP Hudson is not the equivalent of a treating physician whose opinions are accorded great deference under the regulations, *see* 20 C.F.R. §§ 404.1513(a), 416.913(a), her opinion at a minimum should have alerted the ALJ to the potential for disagreement by Dr. Merritt, one of plaintiff's treating sources with whom NP Hudson practices, with the ALJ's RFC finding.

In arriving at his conclusion ALJ Boyer summarily discounted NP Hudson's opinions, according them "only minimal weight".  AT 22.  In light of the ALJ's assurances to the *pro se* claimant that he would do whatever necessary to ensure complete record in that she should "rest assured" to

that effect, *see* AT 36-38, the ALJ's decision, without providing the claimant with any insight as to his intentions in this regard and suggesting that she should seek an opinion from Dr. Merritt, represented a failure on his part to properly develop the record and fill this critical void. *See Gray v. Astrue*, No. 04 Civ. 3736, 2007 WL 2874049, at *6-7 (S.D.N.Y. Oct. 3, 2007) (remanding because the ALJ failed to properly develop the record when the treating physician responded that he could not complete a questionnaire sent by the ALJ and the ALJ did not provide more time to the physician to gather information); *Suriel v. Comm'r of Soc. Sec.*, No. 05-CV-1218, 2006 WL 2516429, at *5-6 (E.D.N.Y. Aug. 29, 2006) (remanding for failing to fully develop the record); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 440-41 (S.D.N.Y. 2003) (remanding due to ALJ's failure to fulfill duty to fill in gaps in the record); *Rosa v. Apfel*, No. 97 Civ. 5831, 1998 WL 437172, at *4 (S.D.N.Y. July 31, 1998) (remanding because the ALJ failed to follow-up on a request to receive a functional assessment).

In sum, because plaintiff was proceeding *pro se*, ALJ Boyer was under an enhanced duty to ensure a complete record and, in this case, to contact Dr. Merritt and Dr. Runge in order to ensure that all of the facts relevant to his RFC determination were sufficiently developed and

considered.  Based upon the finding that the ALJ failed to fulfill this obligation, I recommend that the Commissioner's determination be reversed and the matter remanded to allow the ALJ to properly develop a complete record by contacting plaintiff's treating physician and obtaining complete physical RFC assessments.

3.    Treating Physician

Intertwined with her argument regarding the ALJ's duty to develop the record is plaintiff's claim that the ALJ relied on an RFC assessment from the state agency disability analyst rather than properly giving controlling weight to opinions of her treating physicians.

Ordinarily, the opinion of a treating physician is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588; *Barnett*, 13 F. Supp. 2d at 316.[14]  Such opinions are not controlling,

_____

[14]    The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions
> from your treating sources . . . If we find that a
> treating source's opinion on the issue(s) of the
> nature and severity of your impairment(s) is
> well-supported by medically acceptable
> clinical and laboratory diagnostic techniques
> and is not inconsistent with the other

however, if contrary to other substantial evidence in the record, including the opinions of other medical experts. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588. Where conflicts arise in the form of contradictory medical evidence, their resolution is properly entrusted to the Commissioner. *Veino*, 312 F.3d at 588.

In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]" *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Failure to apply the appropriate legal standards for

---

substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

considering a treating physician's opinions is a proper basis for reversal
and remand, as is the failure to provide reasons for rejection of his or her
opinions.  *Johnson*, 817 F.2d at 985-86; *Barnett*, 13 F. Supp. 2d at 316-
17.

In his decision, ALJ Boyer concluded that the state agency disability
analyst's findings regarding the plaintiff's RFC, upon which his no disability
determination hinged, were "well within the claimant's functional abilities
despite the nurse practitioner's statement that the claimant cannot lift and
carry ten pounds, and cannot stand/walk, or sit even one hour in an eight
hour workday."  AT 22.  ALJ Boyer premised his rejection of NP Hudson's
assessment on his belief that it was largely based on plaintiff's self-
reported limitations and activities, and NP Hudson did not independently
perform a functional capacities study or ask plaintiff to demonstrate her
abilities during an examination.  *Id.*  Accordingly, the ALJ found that the
evidence did not substantiate NP Hudson's opinion, noting that in fact, Dr.
Runge had placed no limitations on plaintiff's functional abilities, and
accorded NP Hudson's opinion only minimal weight.  *Id.*

Unquestionably, NP Hudson is not considered as an acceptable
treating medical source whose opinion is entitled to the same degree of

deference afforded to such treatment source opinions.  20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d); *see also Williams v. Comm'r of Soc. Sec.*, 423 F. Supp. 2d 77, 83 n.5 (W.D.N.Y. 2006).  As a nurse practitioner, however, Ms. Hudson's observations regarding the effects of the medical condition which has, without contradiction, been diagnosed by acceptable medical sources, is evidence which can inform an ALJ's RFC determination, regarding the claimant's functional limitations.  20 C.F.R. §§ 404.1513(d), 416.913(d); *see McConnell v. Astrue*, No. 03-CV-521, 2008 WL 833968, at *16 (N.D.N.Y. Mar. 27, 2008) (McAvoy, S.J.) (noting that the opinions of a nurse practitioner may be used by the Commissioner to show the severity of a claimant's impairment(s) and how it affects his or her ability to work) (citing 20 C.F.R. § 404.1513(d)).

The real treating source failure in this case surrounds the ALJ's failure to recontact Dr. Runge and his mischaracterization of the opinions of that physician.  Nowhere in his office notes, did Dr. Runge state, as the ALJ intimates, that the plaintiff experiences no limitations on her functional abilities as a result of her medical condition.  Indeed, Dr. Runge reported that plaintiff was limited in her ability to lift, carry, stand, walk, sit, push, and pull, although no specific limitations were recorded.  AT 194.

-31-

Moreover, in a second assessment Dr. Runge commented that physical activity aggravated plaintiff's pain, although noting that he generally would not restrict his patients' physical activities and instead encourages them to pace themselves to avoid severe discomfort.  AT 278-81.  These portions of the record contradict the ALJ's assertion regarding Dr. Runge's opinion.

In this instance the ALJ chose to rely upon the opinions of a disability analyst who did not examine the plaintiff, rather than contacting those who treated the plaintiff's condition to obtain more information. Under these circumstances, particularly in view of plaintiff's *pro se* status, the ALJ was dutibound to recontact Dr. Runge and for clarification of his opinions, and Dr. Merritt to obtain an assessment concerning plaintiff's RFC.  *See Villanueva v. Barnhart*, No. 03 Civ. 9021, 2005 WL 22846, at *10-11 (S.D.N.Y. Jan. 3, 2005) (commenting on the interrelatedness of the treating physician's rule and development of the record); *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (stating that "[t]he duty to develop the record goes hand in hand with the treating physician rule, which requires the ALJ to give special deference to the opinion of a claimant's treating physician").  In light of the ALJ's failure to properly develop the record, it is not clear to what extent NP Hudson's opinion may

have been consistent or inconsistent with reports from treating physicians and the disability analyst.  *Villanueva*, 2005 WL 22846, at *11-13.  The summary rejection of NP Hudson's opinions without contacting plaintiff's treating sources whose opinions, if well-supported, would trump those of the State's disability analysis requires that the determination of no disability be reversed and the matter remanded for further consideration.

        4.    Plaintiff's RFC

        The foundation for ALJ Boyer's finding of no disability is his conclusion regarding plaintiff's RFC.  Plaintiff maintains that the RFC determination is not supported by substantial evidence in the record, and that in arriving at his findings the ALJ failed to make a function-by-function analysis.

        A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. §§ 404.1545(a), 416.945(a).  An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis.  *Id*.; *Martone*, 70 F. Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(b), 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered. 20 C.F.R. §§ 404.1545(b), 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris,* 728 F.2d at 587). An RFC determination is subject to the overarching requirement that an agency finding may only withstand judicial scrutiny if there is substantial evidence in the record to support each of its elements. *Martone*, 70 F. Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y. 1997). Only after an individual's functional limitations or restrictions are identified and assessed "on a function-by-function basis . . . may [the] RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Social

-34-

Security Ruling ("S.S.R.") 96-8p, 1996 WL 374184, at *1-2, *Titles II and*

*XVI:  Assessing Residual Functional Capacity in Initial Claims* (S.S.A.

1996); *see also Mardukhayev v. Comm'r of Soc. Sec.*, No. 01-CV-1324,

2002 WL 603041, at *5 (E.D.N.Y. Mar. 29, 2002).  As agency guidelines

explicitly recognize,

> RFC may be expressed in terms of an exertional
> category, such as light, if it becomes necessary to
> assess whether an individual is able to do his or
> her past relevant work as it is generally performed
> in the national economy.  However, without the
> initial function-by-function assessment of the
> individual's physical and mental capacities, it may
> not be possible to determine whether the individual
> is able to do past relevant work as it is generally
> performed in the national economy because
> particular occupations may not require all of the
> exertional and nonexertional demands necessary
> to do the full range of work at a given exertional
> level.

S.S.R. 96-8p, 1996 WL 374184, at *3.

Addressing plaintiff's RFC, ALJ Boyer summarily concluded that she

is capable of meeting the exertional requirements of a full range of

sedentary work.[15]  This finding was made without any meaningful

---

[15]     Sedentary work is defined by regulation as follows:

Sedentary work involves lifting no more than 10 pounds at a
time and occasionally lifting or carrying articles like docket
files, ledgers, and small tools.  Although a sedentary job is
defined as one which involves sitting, a certain amount of

assessment of the plaintiff's work-related abilities on a function-by-function basis, instead apparently adopting wholesale the agency consultant's assessment.

The evidence in the record regarding plaintiff's exertional capacity is by no means overwhelming.

On April 22, 2004, state disability analyst Robert Eurich completed a non-severe impairment checklist and found that medical evidence showed that plaintiff had more than a slight abnormality in her ability to do basic work-related activities in the following areas: 1) walking; 2) standing; 3) sitting; 4) lifting; 5) pushing; 6) pulling; 7) reaching; 8) carrying; 9) handling; 10)  seeing; 11) hearing; and 12) speaking.  AT. 225.  He also found, however, that the medical evidence did not show more than a slight abnormality in plaintiff's ability to: 1) understand, carry out, and remember simple instructions; 2) use judgment; 3) respond appropriately to supervision, co-workers, and usual work situations; and 4) deal with

---

walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).  In addition, a subsequent ruling has clarified that sedentary work generally involves periods of standing or walking for a total of two hours in an eight hour work day, with sitting up to a total of approximately six hours in a similar period.  *See* Social Security Ruling 83-10.

changes in a routine work setting.  *Id.*  Nonetheless, because there were more than slight abnormalities in certain areas, a full sequential evaluation was needed.  *Id.*

Eurich also completed a physical residual functional capacity ("RFC") assessment on that same date.  AT 217-24.  In it, he opined that plaintiff could frequently lift and/or carry less than ten pounds, occasionally lift and/or carry ten pounds, stand and/or walk for at least two hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  AT 218.  Eurich further stated that plaintiff could push and/or pull unlimitedly, occasionally climb, balance, stoop, kneel, crouch, and crawl, and that she had no manipulative, visual, communicative, or environmental limitations. T. 218-22.

Asked to complete a form regarding plaintiff's ability to perform work-related activities, Dr. Runge responded noting that plaintiff is limited in her ability to lift, carry, stand, walk, sit, push and pull, though without noting any specifics regarding the extent of those limitations.[16]  AT 183-95.

---

[16]     On September 25, 2004 the agency once again sent Dr. Runge a medical source statement regarding plaintiff's ability to perform work related activities.  AT 266-71.  In response, however, Dr. Runge again merely stated that physical activity aggravates plaintiff's pain, noting that he does not restrict his patients' physical activity but instead encourages them to pace themselves to avoid severe discomfort.  AT 278-81.

In a medical assessment of plaintiff's ability to perform work-related activities completed on October 27, 2004, NP Hudson opined that plaintiff could occasionally lift up to twenty pounds but never carry anything even up to ten pounds.  AT 301.  NP Hudson stated that plaintiff could only sit, stand, and walk for less than an hour in an eight-hour workday, occasionally grasp, frequently use fine manipulation, and occasionally use her feet.  AT 302.  She further reported that plaintiff had many environmental restrictions, including heights, chemicals, noise, humidity, temperature extremes, and dust.  AT 303.   Faced with these potentially conflicting reports, the ALJ completely failed to specify any of plaintiff's functional limitations, instead summarily concluding that she can fulfill the full range of requirements for sedentary work. The ALJ did not discuss the amount which plaintiff could lift and/or carry, the amount of time she could walk, stand, and sit, or any other postural, manipulative, or environmental limitations.  Although the ability to do sedentary work necessarily implies the most a claimant can do despite her limitations, this does not absolve the ALJ from his duty to outline, function-by-function, plaintiff's restrictions in her ability to do work-related activities and whether or not she has the capacity to work on a regular and continuing basis.  *See Brown v.*

*Barnhart*, No. 01 CV 2962, 2002 WL 603044, at *5-7 (E.D.N.Y. Apr. 15, 2002).[17]  This shortcoming provides another basis for my recommendation that the matter be remanded to the agency for further consideration.

5.   <u>Grid and Vocational Expert</u>

In an extension of her RFC argument, plaintiff maintains that the ALJ's error was compounded when he based his disability finding solely upon the grid, opting not to elicity testimony from the vocational expert who was standing by at the hearing.

Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grid.  *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  The grid takes into consideration a claimant's RFC, as well as his or her age, education and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy.  *Rosa*, 168 F.3d at 78.  Whether or not the grid should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved.

---

[17]      Although the ALJ found that plaintiff could not perform her past relevant work based on the RFC determination, the ALJ's failure to articulate any of plaintiff's limitations obviously impacted his determination at step five of the sequential analysis.

*Bapp*, 802 F.2d at 605.  If a plaintiff's situation fits well within a particular classification, then resort to the grid is appropriate.  *Id.*  If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grid is inappropriate, in which case further evidence and/or testimony is required.[18]  *Rosa*, 168 F.3d at 78; *Bapp*, 802 F.2d at 605-06.

The ALJ's ultimate finding, which was derived from resort to the grid, is entirely dependent upon an RFC which was made without proper analysis, and was the product of the ALJ's failure to develop the record and thus cannot withstand judicial scrutiny.  Moreover, the ALJ's

---

[18]     Exertional limitations refer to restrictions imposed by a claimant's impairment(s) that affect the ability to meet strength demands of a job such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. §§ 404.1569a(b), 416.969a(b).  Non-exertional limitations refer to limitations affecting the claimant's ability to meet the requirements of a job other than strength demands.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).  This includes, *inter alia*, limitations or restrictions in functioning due to nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, and performing manipulative or postural functions such as reaching, handling, stooping, climbing, crawling, or crouching.  *Id.*; *see also* S.S.R. 83-14, 1983 WL 31254, at * 1, *Program Policy Statement–Titles II and XVI: Capability to do Other Work – The Medical Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments* (S.S.A. 1983).   As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain.

*Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569(a), (c)).

determination fails to consider the extent of plaintiff's pain and other nonexertional limitations upon her ability to perform a full range of work upon which the grid is predicated.

In order to "'significantly diminish' the claimant's range of work, a non-exertional impairment must cause an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him [or her] of a meaningful employment opportunity.'" *Brown*, 2005 WL 1745655, at *3 (quoting *Bapp*, 802 F.2d at 606 n.1).  Thus, the "'mere existence of a non-exertional impairment [will] not automatically require the production of a vocational expert nor preclude reliance on the guidelines.'" *Davila v. Barnhart*, No. 03 Civ. 3981, 2004 WL 2914073, at *7 (S.D.N.Y. Dec. 15, 2004) (quoting *Bapp*, 802 F.2d at 603).  If a claimant's ability to perform work is significantly diminished, due to the presence of a non-exertional impairment, then the Commissioner "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Bapp*, 802 F.2d at 603; *Rosa*, 168 F.3d at 82 (quoting *Bapp*); *Brown*, 2005 WL 1745655, at *3 (citations omitted).

In this case, the ALJ found that because the evidence supported a finding that plaintiff could perform the demands of the full range of sedentary work, a finding of not disabled was directed by medical vocational rule 201.26.  AT 24.  This determination cannot withstand scrutiny, both because it is based upon an RFC determination that cannot be maintained in light of plaintiff's challenge, and because it fails to take into account the effects of plaintiff's pain upon her ability to work.  This error is particularly perplexing in light of the ready availability of a vocational expert whose testimony could, and undoubtedly should have been elicited in order to assist in determining whether the Commissioner's burden at step five of the disability test was met.  This then provides a further basis for reversal of the Commissioner's determination.

### 6.    Plaintiff's Credibility

The last point raised in support of her challenge to the ALJ's finding of no disability concerns the rejection of her claims of disabling pain as not being fully credible.  *See* AT 23.  That rejection was based principally upon the lack of supporting medical evidence reflecting the existence of a condition which could be reasonably be expected to result in limitations testified to by the plaintiff in her ability to stand and to sit, as well as the

extent of her daily activities.

An ALJ must take into account subjective complaints of pain in making the five step disability analysis.  20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d).  When examining the issue of pain, however, the ALJ is not required to blindly accept the subjective testimony of a claimant. *Marcus*, 615 F.2d at 27; *Martone*, 70 F. Supp. 2d at 151 (citing *Marcus*). Rather, an ALJ retains the discretion to evaluate a claimant's subjective testimony, including testimony concerning pain*.  See Mimms v. Heckler,* 750 F.2d 180, 185-86 (2d Cir. 1984).  In deciding how to exercise that discretion the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's credibility, his or her motivation, and the medical evidence in the record.  *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28)).  In doing so, the ALJ must reach an independent judgment concerning the actual extent of pain suffered and its impact upon the claimant's ability to work.  *Id.*

When such testimony is consistent with and supported by objective clinical evidence demonstrating that claimant has a medical impairment

which one could reasonably anticipate would produce such pain, it is

entitled to considerable weight.[19]  *Barnett*, 13 F. Supp. 2d at 316; *see also*

20 C.F.R. §§ 404.1529(a), 416.929(a).  If the claimant's testimony

concerning the intensity, persistence or functional limitations associated

with his or her pain is not fully supported by clinical evidence, however,

then the ALJ must consider additional factors in order to assess that

testimony, including: 1) daily activities; 2) location, duration, frequency and

intensity of any symptoms; 3) precipitating and aggravating factors; 4)

type, dosage, effectiveness and side effects of any medications taken; 5)

other treatment received; and 6) other measures taken to relieve

symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

     After considering plaintiff's subjective testimony, the objective

medical evidence, and any other factors deemed relevant, the ALJ may

accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp. 2d

at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such

testimony is rejected, however, the ALJ must explicitly state the basis for

doing so with sufficient particularity to enable a reviewing court to

---

     [19]  In the Act, Congress has specified that a claimant will not be viewed as
disabled unless he or she supplies medical or other evidence establishing the
existence of a medical impairment which would reasonably be expected to produce the
pain or other symptoms alleged.  42 U.S.C. § 423(d)(5)(A).

determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 151 (citing *Brandon v. Bowen,* 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review. *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984).

When evaluating plaintiff's subjective complaints of pain, one must consider the nature of plaintiff's diagnosed condition. The plaintiff has been diagnosed with fibromyalgia and myofascial pain disorder. Such a diagnosis does not translate into an automatic finding of disability; it is not the presence of such a medical condition, but rather its limitations, which inform the question of whether or not a plaintiff is under a disability.[20] *Alvarez v. Barnhart*, No. 03 Civ. 8471, 2005 WL 78591, at *2 (S.D.N.Y.

---

[20]     Fibromyalgia is described by a leading medical source as:

[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites.

Stedmans Medical Dictionary (27th ed. 2000). Fibromyalgia is also commonly referred to as fibrositis. *Green-Younger v. Barnhart*, 335 F.3d 99, 101 n.1 (2d Cir. 2003).

Jan. 12, 2005) (citing, *inter alia*, *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)).  Undeniably, fibromyalgia is recognized as a potentially severe impairment that may support a claim of disability under the Act, *Green-Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir. 2003), and by its very nature, fibromyalgia is not always readily susceptible to detection or verification through clinical testing or other objective means, *see id.*; *see also Cruz v. Apfel,* 97 Civ. 1170, 1998 U.S. Dist. LEXIS 23385, at *22-23 (N.D.N.Y. Nov. 4, 1998) (Di Bianco, M.J.), *adopted*, 1998 U.S. Dist. LEXIS 23384 (N.D.N.Y. Dec. 21, 1998) (Kahn, D.J.).  Addressing the condition, the Seventh Circuit has explained that:

> fibromyalgia . . . [is] a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features.  Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.  All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. . . . Some people may have such a severe case of fibromyalgia as to be totally disabled from

working, but most do not[.]

Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996) (internal citations omitted).

Despite its elusiveness and potentially debilitating effects, fibromyalgia, like many other medical conditions, is one which may be, but is not necessarily, so limiting as to qualify as disabling under the Act. See Coyle v. Apfel, 66 F. Supp. 2d 368, 376-77 (N.D.N.Y. 1999) (Hurd, J.). Consequently, in cases involving claimants diagnosed as suffering from fibromyalgia, "the credibility of the claimant's testimony regarding [his or] her symptoms takes on substantially increased significance in the ALJ's evaluation of the evidence[.]" Id. at 376 (internal quotation marks and citation omitted). This is so because "'physical examinations will usually yield normal results - a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.'" Green-Younger, 335 F.3d at 108-09 (quoting Lisa, 940 F.2d at 45. Thus, the Second Circuit has noted that "the absence of swelling joints or other orthopedic and neurologic deficits 'is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced.'" Id. at 109 (quoting Sarchet,

78 F.3d at 307).  Accordingly, negative findings in the medical records "simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating 'other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.'"  *Id.* (quoting *Preston v. Sec'y of Dep't of Health and Human Servs.*, 854 F.2d 815, 819 (6th Cir. 1988)).

In this case, ALJ Boyer observed that plaintiff habitually failed to follow prescribed treatment courses, particularly the recommendation that she lose weight, even thought her doctors tried to place her on a weight loss program, and referred her to a nutritionist.  AT 23.  The ALJ also noted that plaintiff did not follow through with prescribed exercise, stretching, and increased activity and that she only took Ibuprofen for her pain and headaches.  *Id.*  ALJ Boyer further observed that plaintiff sat for an hour during the hearing, sat in the waiting room, and drove prior to the hearing, all without discomfort.  *Id.*  The ALJ additionally noted that plaintiff was able to care for her personal needs, go shopping, visit with friends, and go for long walks, all without assistance, as well as travel with her parents to Florida during the winter.  AT 22.

Despite these observations, the ALJ's credibility determination is not

defensible.  At the outset, the ALJ failed to state in his decision whether

plaintiff's medical impairments "could reasonably be expected to produce

the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a),

416.929(a).  Instead, he proceeded directly to the second part of the

analysis by applying the factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-

(vi), 416.929(c)(3)(i)-(vi).

    This error was aggravated when, while reviewing the medications

plaintiff took, the treatment she received, her symptoms, daily activities,

and measures taken to relieve the symptoms, the ALJ did not properly

assess these factors.  Addressing plaintiff's weight, it should be noted that

although she has had difficulty in losing weight and sustaining a diet, she

has visited a nutritionist and attempted to overcome her problem.  *See* AT

199, 236, 291, 293, 277, 325, 327.  The mere fact that claimant has been

unable to accomplish the objective of losing weight does not equate to the

ALJ's statement that she "habitually" failed to follow prescribed treatment.

    The ALJ's description of plaintiff's lack of prescribed exercise and

therapy, as well as her use of medications, is perplexing.  The ALJ

chastises plaintiff for failing to comply with an exercise regimen prescribed

by her physicians, yet seems to use the fact that the plaintiff has

undergone aqua therapy at the YMCA against her, observing that the

plaintiff's testimony that she could not perform much activity was belied by

her attendance at aqua therapy.  AT 22-23.  It should be noted that from

November 2003 until March 2004, plaintiff in fact attended physical

therapy and exercised in accordance with her doctors recommendations.

AT 53-54, 180, 196, 201, 204-13, 282.  Plaintiff was also told to attend

aquatic physical therapy three times a week for eight weeks, a directive

with which she complied, as aptly noted by the ALJ himself.  AT 54, 182,

235-38.  Based on these circumstances, it is difficult to reconcile the ALJ's

statements regarding plaintiff's exercise with the evidence in the record.

Turning to plaintiff's medications, the ALJ claims that the only

medication taken by plaintiff was Ibuprofen.  Plaintiff's medical records,

however, indicate otherwise.  It does not appear that the claimant

interpreted the question of requesting a list of all medications taken by

plaintiff to address her symptoms.[21]  Those records reveal that during the

course of plaintiff's medical treatment, she was prescribed numerous

---

[21]    When questioning plaintiff on the subject, the ALJ asked only what she
considered to be her primary medication, to which she responded Ibuprofen.  AT 51.
As an aside, it should be noted that plaintiff was taking the maximum dosage of the
drug on each occasion, at 800 milligrams, and not a normal adult dosage.  *Compare*
Ibuprofen, http://www.cancerhelp.org.uk/help/default.asp?page
=28429 (last visited May 1, 2008) *with* Ibuprofen,http://www.drugs.com/
ibuprofen.html (last visited May 1, 2008).

medications, including Prednisone, Naprosyn, Topral, Elavil, Hydrocodone, Amitriptyline, and Topomax.  *See* AT 235, 240, 243-44, 289, 321, 323.

The ALJ's apparent reliance upon the observations of a hearing reporter regarding the claimant's discomfort is simply not the sort of evidence that can provided a basis to discount a claimant's complaints of pain or discomfort.  To the extent that the ALJ may have relied upon notes made by the hearing reporter, those notes are not a part of the record, and thus cannot be reviewed by the court in making its substantial evidence determination.  To the extent that the ALJ addressed the plaintiff's conduct in the waiting room and in her car driving to and from the hearing, where the ALJ was not present, those observations are the result of pure speculation and have no place in the disability analysis.   Moreover, the ALJ's use of these "observations" to discount the effects of plaintiff's fibromyalgia and headaches and their interference with her ability to perform work functions overlooks a considerable body of medical evidence detailing the plaintiff's fibromyalgia as well as the frequent occurrence of her headaches and the other symptoms associated with that condition.  See, e.g., AT 179-80, 182, 196, 199, 201, 229, 231, 233,

235-38, 240, 282, 289, 291, 319-24.

The plaintiff's accounts of her daily activity similarly fail to lend support to the ALJ's determinations.  It is true that in her daily activities questionnaire plaintiff stated she was able to do her laundry, care for her personal needs, and perform household chores all without assistance, as well as drive, shop, visit friends, watch television, read, take naps, and go for long walks.  AT 22.  In that questionnaire, however, the plaintiff also noted that she keeps the cleaning to a minimum and does not do the dishes all the time, becomes short of breath while loading and unloading the laundry, experiences pain at times when folding laundry, and has difficulty ironing.  AT 119.  The plaintiff further noted that in doing household chores, she would also have difficulty opening jars and lifting things because her legs would give out and her arms would go numb and fall asleep.  *Id.*  Plaintiff also reported that with respect to her personal care, she is unable to wear a bra, jeans, or overalls because they are constrictive and it is difficult for her to move her arms, she uses a handheld shower device because she cannot reach certain places, she only shaves once a week, she does not use a hair dryer, and she has to support herself by leaning against the wall when using the bathroom.  AT

117-18.  Plaintiff further noted that she used to spend time with friends but rarely goes out anymore, she cannot take long walks, and she sometimes cannot drive when she takes Hydrocodone.  AT 117, 119.  This information contradicts most of the ALJ's statements regarding plaintiff's daily activities.[22]

In sum, the ALJ's determination regarding plaintiff's credibility is not supported by substantial evidence, providing yet another basis for reversal and remand to the agency for further proceedings.

IV.   SUMMARY AND RECOMMENDATION

_____In arriving at his determination of no disability, the ALJ disregarded his obligation to properly develop the record concerning plaintiff's RFC by failing to obtain information from her treating physicians.  The ALJ's RFC finding, which serves as the lynchpin for his determination of no disability, is not well supported, based both upon the failure to complete the record and his omission of a function-by-function analysis of plaintiff's capacity.  These errors were compounded by the ALJ's reliance upon the grid to

_____

[22]      In his decision, the ALJ placed great emphasis upon the fact that the plaintiff is able to go to Florida with her parents on occasion during the winter.  AT 22.  This finding grossly misstates plaintiff's actual testimony, to the effect that in the past two years since she has been unable to work she has not been to Florida with her parents.  AT 53.

determine disability, despite the existence of lack of substantial evidence to support his RFC determination and the existence of non-exertional limitations, including pain, making resort to the grid inappropriate.  Finally, the ALJ's rejection of plaintiff's subjective pain complaints and resulting credibility determination is not supported by substantial evidence in the record, and ignores considerable contrary evidence.  In view of these errors, I recommend that the Commissioner's determination be reversed and the matter remanded to the agency for further consideration.

Based on the foregoing it is hereby

RECOMMENDED that plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability VACATED, and the matter REMANDED to the agency for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      May 1, 2008
            Syracuse, NY


David E. Peebles
U.S. Magistrate Judge